**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PATRICIA TUROSIK, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Case No. 08-1248 |
| | ) | |
| RONALD L. HOUGUE, JR., | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

## I. INTRODUCTION

Pending before the court is the motion for summary judgment (ECF No. 38) filed by Ronald L. Hougue, Jr. ("defendant" or "Hougue") seeking judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 against Patricia Turosik ("plaintiff" or "Turosik") with respect to all claims asserted in plaintiff's amended complaint (ECF No. 23). Defendant additionally argues that plaintiff's claims are barred by qualified immunity and the *Heck* doctrine. Plaintiff disputes these assertions.

Plaintiff's claims are asserted under 42 U.S.C. § 1983 (civil action for deprivation of rights), citing violations under the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Pennsylvania state law. This court exercises subject-matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights), and over plaintiff's state claims pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction). For the following reasons, defendant's motion for summary judgment will be GRANTED, in part, and DENIED, in part.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Between 10:00 p.m. and 10:30 p.m. on September 7, 2007,[1] Turosik entered the Monaca Croatian Club (the "Club"). (Joint Concise Statement of Material Facts of the Parties (ECF No. 48) ("C.S.") at 1 − 3). Turosik was accompanied by her brother and met some friends at the Club. (ECF No. 48, C.S. at 3). Turosik and her friends ordered drinks. (ECF No. 48, C.S. at 6). A man by the name of Arthur Knox ("Knox") entered the Club at some point that evening. (ECF No. 48, C.S. at 6). Turosik and Knox had a history of animosity toward one another. (ECF No. 48, C.S. at 6). Turosik was involved in a brief exchange of words with Knox shortly after his arrival. (ECF No. 48, C.S. at 7; ECF No. 41-1 at 20).

Turosik and her friends sang karaoke while at the Club, and continued to drink and move about the Club. (ECF No. 48, C.S. at 8-10). The Club owner, Ronald Eaton ("Eaton") approached Turosik while she was singing, and spoke to her in an allegedly "mean and nasty" manner regarding her karaoke performance and use of karaoke equipment. (ECF No. 48, C.S. at 10-11; ECF No. 41-1 at 21). After being approached by Eaton, Turosik handed the karaoke microphone to him and indicated that she would stop singing. (ECF No. 48, C.S. at 11). At this point, Eaton allegedly referred to Turosik using a strongly derogatory term, and Turosik responded by throwing beer into his face. (ECF No. 48, C.S. at 1-3, 11; ECF No. 41-1 at 21). Eaton punched Turosik in the head. (ECF No. 48, C.S. at 11). A brawl between Turosik's

---

[1] Plaintiff and defendant dispute the actual date of the events in question; plaintiff asserts the event began late in the evening on Friday, September 7, 2007, and defendant asserts that the event took place late in the evening on Saturday, September 8, 2007. Records from Medic Rescue Ambulance and the 9-1-1 incident reports indicate that the event in question began late in the day on September 8, 2007. (ECF No. 33-1; ECF No. 44-2). Viewing the evidence in the light most favorable to the nonmoving party (plaintiff), the court will refer to September 7, 2007, as the date of the incident.

friends and Eaton's friends ensued. (ECF No. 48, C.S. at 12). Turosik and her brother fled from the Club. (ECF No. 48, C.S. at 12).

The commotion followed Turosik outside as she was getting into her car with her brother. (ECF No. 48, C.S. at 16, 19). Turosik and her brother were both pulled from the car and assaulted while on the ground by a number of Club patrons, including Knox, and a woman named Melissa Ball ("Ball"). (ECF No. 48, C.S. at 1-3, 17). Eaton and a fourth individual participated in kicking Turosik's body and head while she lay on the ground. (ECF No. 48, C.S. at 18). Three calls were made to 9-1-1 summoning police beginning at approximately 11:30 p.m. (ECF No. 48, C.S. at 19). Hougue and Officer Benjamin Regney ("Regney") were en route to the scene by approximately 11:32 p.m. (ECF No. 48, C.S. at 19-20). Hougue and Regney were the first officers on scene. (ECF No. 48, C.S. at 20).

The parking lot outside the Club was described as a confusing and somewhat chaotic, hysterical scene, and Turosik was found by Hougue on her feet, crying and screaming that she was in pain and had been assaulted. (ECF No. 48, C.S. at 21-22; ECF No. 41-2 at 6; ECF No. 41-7 at 27, 30, 43). The crowd outside the Club included neighbors exiting their homes to witness the ongoing commotion. (ECF No. 48, C.S. at 21-22; ECF No. 41-7 at 31). Hougue eventually managed to control the scene despite the confusion created by the crowd, though Turosik continued yelling for a time. (ECF No. 48, C.S. at 28-30).

Turosik's daughter arrived on the scene following the police officers' arrival. (ECF No. 48, C.S. at 22). Hougue and she approached Turosik together. (ECF No. 48, C.S. at 22-23). Turosik immediately stated that she had been attacked and requested an ambulance, because she believed she had suffered a head injury. (ECF No. 48, C.S. at 23). She allegedly continued to engage in verbal exchanges with patrons inside the Club. (ECF No. 41-14 at 5). Turosik's

3

speech may have been slurred, possibly as a result of being kicked in the head. (ECF No. 48, C.S. at 25-26). Plaintiff eventually calmed down and identified the individuals she believed had assaulted her. (ECF No. 48, C.S. at 25-26). She continued to ask Hougue to call for an ambulance. (ECF No. 48, C.S. at 24-25).

Hougue placed Turosik in the back of a police cruiser, not for the purpose of arrest, but to separate her from other patrons of the Club in order to continue his investigation. (ECF No, 48, C.S. at 27). Turosik again asked that an ambulance be summoned, and Hougue replied that he would put in a call. (ECF No. 48, C.S. at 27-28; ECF No. 41-1 at 33). Turosik called for an ambulance on her own while in the car. (ECF No. 41-1 at 30, 34). A "Priority 1 – 2 Min Max" call for an ambulance was placed at approximately 11:31 p.m. (ECF No. 48, C.S. at 29; ECF No. 33-1 at 1-2). An ambulance was dispatched at 11:44 p.m. for a reported "head injury." (ECF No. 48, C.S. at 29; ECF No. 33-1 at 1-2). Two subsequent, "duplicate," calls to 9-1-1 about the events at the Club were recorded following the first call. (ECF No. 33-1 at 3–6).

Hougue spoke with Turosik's friends, as well as Eaton and Knox. (ECF No. 48, C.S. at 30). While away from Turosik, Hougue overheard – either directly or from another police officer – that a radio dispatcher, possibly from 9-1-1, announced that a woman had a cell phone, and that the cell phone should be taken away because she was attempting to call 9-1-1. (ECF No. 48, C.S. at 30-32; ECF No. 41-2 at 10; ECF No. 41-6 at 2; 41-7 at 36-37; ECF No. 41-14 at 9). The identity of the dispatcher making the radio call, and the origin of the call are unknown. (ECF No. 48, C.S. at 32). Hougue believed that Turosik was the woman mentioned in the radio call, she was tying up the 9-1-1 hotline, and her cell phone needed to be removed from her person. (ECF No. 48, C.S. 32-33; ECF No. 41-14 at 9–10; ECF No. 41-15 at 13). Turosik's friend

Roberta Campbell – present at the time, and having overheard the radio call – also understood the call to refer to Turosik. (ECF No. 41-7 at 36-37).

Hougue opened the car door while Turosik was sitting in the car and using her phone; Hougue demanded – without explanation – that Turosik turn over her cell phone. (ECF No. 48, C.S. at 34-35; ECF No. 41-1 at 35; ECF No. 41-11 at 1; ECF No. 41-14 at 10). Turosik slid to the other side of the car, refused to provide the officer with the phone, and threw the phone away from him and onto the floor. (ECF No. 48, C.S. at 34-35; ECF No. 41-1 at 34; ECF No. 41-11 at 1-2; ECF No. 41-14 at 10-13). As Hougue attempted to enter into the car to retrieve the phone from Turosik, she allegedly began to scream and kick at Hougue. (ECF No. 48, C.S. at 36; ECF No. 41-14 at 10-13). Hougue had not explained the reason for demanding the phone. (ECF No. 48, C.S. at 36).

Hougue informed Turosik that he was placing her under arrest for assaulting a police officer, and struggled to restrain her. (ECF No. 48, C.S. at 36-38; ECF No. 41-14 at 10-13). Turosik vigorously resisted Hougue's attempt to remove her from the car to place her under arrest. (ECF No. 48, C.S. at 37; ECF No. 41-14 at 10-13). In the ensuing struggle, Turosik allegedly kicked Hougue and struck him in the face with her arms, and Turosik was allegedly punched at least once in the ribs. (ECF No. 48, C.S. at 33, 37, 39; ECF No. 41-1 at 3, 39; ECF No. 41-14 at 10-13). Turosik suffered bruises she attributed to her struggle with Hougue inside and outside the police cruiser, and her subsequent handcuffing. (ECF No. 48, C.S. at 33, 39). Hougue eventually removed Turosik from the car by grabbing her legs and pulling her out. (ECF No. 48, C.S. 37-38; ECF No. 41-1 at 36; ECF No. 41-14 at 10-13).

While Turosik was handcuffed and awaiting the arrival of an ambulance, she continued hysterically screaming. (ECF No. 48, C.S. at 40). When the ambulance reached the scene, a

minute or two later, Hougue removed Turosik's handcuffs and admonished her to stop screaming and act appropriately in order that the ambulance crew could care for her injuries. (ECF No. 48, C.S. at 41; ECF No. 41-1 at 37-38). The ambulance took Turosik to Aliquippa Hospital. (ECF No. 48, C.S. at 40). Hougue rejoined the other officers who had arrived at the scene. (ECF No. 48, C.S. at 41).

Prior to the time of the incident, Turosik had caused Hougue no problems. (ECF No. 48, C.S. at 33). It was later found that there was no definitive evidence in the 9-1-1 hotline phone logs that the lines were being tied up by Turosik, or that she had successfully called 9-1-1. (ECF No. 48, C.S. at 32; ECF No. 41-1 at 34-35).

Following the events of September 7, 2007, Hougue continued to conduct an investigation, contacting Turosik, her daughter and friends, Eaton, and other Club patrons that had participated in the fighting. (ECF No. 48, C.S. at 41). On or about October 10, 2007, Hougue filed a police report depicting his interpretation of the events of the night in question, based upon the accounts of those involved. (ECF No. 48, C.S. at 41). Eaton, Knox, and Ball were charged with summary assault, summary harassment, and disorderly conduct. (ECF No. 48, C.S. at 42). They entered into plea agreements, under which the charges would be reduced to only the disorderly conduct offense if they each paid Turosik $850.00 in restitution for medical bills. (ECF No. 48, C.S. at 42). Turosik was never paid this restitution and all charges were later dropped, because she failed to appear in court. (ECF No. 48, C.S. at 43). Turosik argues that she was never told to attend the hearing in question. (ECF No. 48, C.S. at 43). Charges against the three individuals were later refiled. (ECF No. 48, C.S. at 44).

On February 11, 2008, Turosik was charged by Hougue with three counts of disorderly conduct, resisting arrest, simple assault, and harassment. (ECF No. 48, C.S. at 44). Turosik was

fingerprinted, and her bail conditions required her to remain in Pennsylvania. (ECF No. 48, C.S. at 44-45). Due to that condition, she claims that she missed a job opportunity in North Carolina. (ECF No. 48, C.S. at 45). Hougue alleges that he waited approximately four months to charge Turosik because she was a victim, and he wanted her cooperation in resolving the criminal case against Eaton, Knox, and Ball. (ECF No. 48, C.S. at 45-47).

Following Turosik's preliminary hearing on June 20, 2008, the charge of resisting arrest was dismissed. (ECF No. 48, C.S. at 47). On the remaining charges Turosik never entered a plea of guilty; instead, she agreed to Accelerated Rehabilitative Disposition ("ARD") on May 4, 2009, with respect to the misdemeanor disorderly conduct charge (count three). (ECF No. 48, C.S. at 11, 48; ECF No. 41-32 at 9-10; ECF No. 41-33). In exchange, the assistant district attorney agreed to *nol pros* the other remaining charges. (ECF No. 48, C.S. at 11, 48; ECF No. 41-32 at 9-10). A petition for nolle prosequi was granted by the court as to those other charges on May 20, 2009. (ECF No. 41-34).

On January 11, 2008, Turosik notified the Borough of Monaca about her intention to sue the borough and Hougue pursuant to 42 PA. CONS. STAT. § 5522(a) (notice prerequisite to action against government unit) for the events of the night in question. (ECF No. 41-27). Turosik filed a complaint with this court on September 8, 2008. (ECF No. 1). An amended complaint was filed on June 16, 2009. (ECF No. 23). On August 12, 2009, this court dismissed plaintiff's claims against the Borough of Monaca, without prejudice. Plaintiff did not refile her claims against the borough. Hougue filed his motion for summary judgment on April 30, 2010. (ECF No. 38). Turosik filed her response on June 15, 2010. (ECF No. 45). The matter has been fully briefed.

**III.** **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a.) Motion for Summary Judgment or Partial Summary Judgment.**
>
> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> …
>
> **(c) Procedures.**
>
> > **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> >
> > > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> > >
> > > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); s*ee Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A

genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322-23). The United States Supreme Court emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. *Doe*, 242 F.3d at 446; *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).


IV. **DISCUSSION**

A. *§ 1983 – Legal Framework*

Plaintiff asserts claims under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

Section 1983 provides a remedy for violations of constitutional rights, and enforceable rights, privileges, or immunities created by federal laws. *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 534-35 (3d Cir. 2002); *see Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). To state a claim under § 1983, a plaintiff is required to show that an individual acting under color of state law violated the plaintiff's constitutional or statutory rights. *West v. Atkins*, 487 U.S. 42, 48 (1988).

In the present case, plaintiff argues that defendant is liable under § 1983 for injuries sustained through false arrest, use of excessive force, malicious prosecution, and retaliation by defendant, in violation of plaintiff's First, Fourth, and Fourteenth Amendment rights, and Pennsylvania law. (ECF No. 23). Defendant counters that he is entitled to judgment as a matter of law, because plaintiff not only failed to satisfy the requirements for each of her claims, but her claims are also barred by the *Heck* doctrine and qualified immunity. (ECF No. 38).

B. *Fourth Amendment Claims*

Under the Fourth Amendment, citizens have the right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. A warrantless arrest may be justified when it can be shown that probable cause to believe that a crime was being or had been committed, existed. *Wright v. City of Phila.*, 409 F.3d 595, 601 (3d Cir. 2005) (citing *Devenpeck v. Alford*, 543 U.S. 146, (2004)). An arrest, however, violates the Fourth Amendment if effected without probable cause or with an unreasonable use of force. *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Patzig v. O'Neil*, 577 F.2d 841 (3d Cir. 1978)).

(1) *False Arrest Claim*

Plaintiff argues that she was the victim of a false arrest. To prove such a claim, she must establish that: (1) she was detained, and (2) the detention was unlawful. *Marable v. West Pottsgrove Twp.*, 176 F. App'x 275, 280 (3d Cir. 2006). In the present case, it is not disputed that plaintiff was detained as a result of her arrest by defendant. Here, the dispute arises with respect to whether defendant had probable cause to arrest plaintiff in the first place. Plaintiff argues that probable cause was lacking because the totality of the circumstances did not justify an arrest either for use of a cell phone or for resisting arrest – as defendant stated at the time of arrest.

Probable cause exists when "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). The court must look to whether there was probable cause to make an arrest for any criminal offense that could have been charged under the circumstances. *Wright*, 409 F.3d at 602 (citing *Barna v. City of Perth Amboy*, 42 F.2d 809, 819 (3d Cir. 1994)); s*ee Devenpeck v. Alford*, 543 U.S. 146, 153-54 (2004). The court must consider the totality of the circumstances. *Reedy*, 615 F.3d at 211.

Plaintiff openly admits in her brief in opposition that, "Hogue [sic] was justified in arresting the Plaintiff on the charge of disorderly conduct for her admittedly bad behavior in pouring beer on Ronald Eaton." (ECF No. 46 at 8). The circumstances surrounding plaintiff's arrest – even when viewed in the light most favorable to plaintiff – support plaintiff's admission. (ECF No. 41-1 at 21-22). It is irrelevant whether or not defendant mistakenly believed he had

either the probable cause to arrest plaintiff for using her cell phone or for assaulting him, because at the time of arrest, defendant had probable cause to arrest her for disorderly conduct. (ECF No. 46 at 8, 12). All that is required is that there was probable cause to make an arrest for *any* criminal offense that could have been charged under the circumstances. *Wright*, 409 F.3d at 602. As plaintiff made no other argument regarding the unlawfulness of her detention by defendant, the existence of probable cause to arrest for disorderly conduct at the time of plaintiff's arrest defeats her § 1983 false arrest claim.[2]

### *(2) Malicious Prosecution Claims*

A claim of malicious prosecution requires a plaintiff to show: (1) the criminal proceeding was initiated by the defendant; (2) the criminal proceeding terminated favorably for the plaintiff; (3) the proceeding was initiated without probable cause; (4) the defendant's act of initiating the proceeding was malicious or not for the purpose of bringing the plaintiff to justice; and, (5) the plaintiff was subject to an unconstitutional seizure as a consequence of the legal proceeding.

---

[2] Plaintiff's state law claim for false arrest will be defeated for similar reasons. Pennsylvania adheres to the same standard as the federal courts regarding probable cause. *Commonwealth v. Evans*, 685 A.2d 535, 537 n.2 (Pa. 1996) (citing *Commonwealth v. Weidenmoyer*, 539 A.2d 1291 (Pa. 1988); *Commonwealth v. Gray*, 503 A.2d 921 (Pa. 1985)). In Pennsylvania

> [p]robable cause exists if the facts and circumstances within the knowledge of the police officer at the time of the arrest are sufficient to justify a person of reasonable caution in believing the suspect has committed or is committing a crime. In determining whether probable cause existed in a particular situation a court will look not just at one or two individual factors, but will consider the "totality of the circumstances" as they appeared to the arresting officer[.]

*Commonwealth v. Burnside*, 625 A.2d 678, 681 (Pa. Super. Ct. 1993) (citing *Commonwealth v. Simmons*, 440 A.2d 1228, 1234 (Pa. Super. Ct. 1982)). A claim for false arrest in Pennsylvania requires that a plaintiff was not only detained, but was unlawfully detained. *Manley*, 997 A.2d at 1241 (citing *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)). "An arrest based upon probable cause would be justified, regardless of whether the individual arrested was guilty or not." *Id.* (citing *Fagan v. Pittsburgh Terminal Coal Corp.*, 149 A. 159 (1930). In the present case, not only was there probable cause to arrest plaintiff for disorderly conduct on September 7, 2007, but plaintiff entered into ARD on the charge of disorderly conduct. As with her § 1983 claim, plaintiff's state claim for false arrest fails because her detention was not unlawful – defendant had probable cause to arrest her for disorderly conduct.

*Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007). The malicious prosecution claim will not survive, however, because plaintiff cannot show the proceeding lacked probable cause.[3]

As noted above, it is irrelevant what crimes a suspect is eventually charged with, as long as probable cause existed with respect to any offense that could have been charged under the circumstances. *Wright*, 409 F.3d at 602 – 04. Probable cause clearly existed with respect to the charge of disorderly conduct. As a result, the malicious prosecution element requiring that proceedings be initiated without probable cause is not met.[4]

### *(3)  Use of Excessive Force Claim*

Plaintiff argues that her arrest violated the Fourth Amendment because defendant used excessive force. To establish the existence of excessive force, a plaintiff must show that a "seizure" occurred, and that the seizure was unreasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). Defendant asserts that the totality of the circumstances justified the manner in which he removed plaintiff from the police cruiser to arrest her.

Here, the court must apply an objective, "totality of the circumstances" analysis to determine whether the force used in effecting a seizure was reasonable. *Abraham v. Raso*, 183, F.3d 279, 289 (3d Cir. 1999). The facts and circumstances faced by an officer at the moment of

---

[3] For the same reasons plaintiff's § 1983 claim for malicious prosecution fails, her state law claim for malicious prosecution also fails under Pennsylvania law. In Pennsylvania, malicious prosecution requires a showing that proceedings were instituted against a plaintiff by a defendant without probable cause, with malice, and those proceedings terminated in favor of the plaintiff. *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010) (citing *Turano v. Hunt*, 632 A.2d 822, 824 (Pa. Commw. Ct. 1993)).

    As discussed *supra*, at note 2, there is no dispute that defendant had probable cause to arrest plaintiff for disorderly conduct. Therefore, the elements for malicious prosecution under Pennsylvania law are not met.

[4] It is noted that plaintiff would have this court follow the diverging opinion in *Johnson v. Knorr*, 477 F.3d 75 3d Cir. 2007), with respect to the probable cause analysis in cases involving malicious prosecution. (ECF No. 46 at 7 – 12). The court, however, finds plaintiff's argument unpersuasive in light of the holding in *Kossler v. Crisanti*, 564 F.3d 181 (3d Cir. 2009), wherein the Court of Appeals for the Third Circuit recognized the inherent conflict between the holdings in *Johnson* and *Wright*. *Id*. at 194. *Kossler* instructs that established precedent dictates that the earlier case be given controlling weight. *Id*. at 194 n. 8 (quoting *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008)). *Wright*, not *Johnson*, is the effective precedent, here. *Id*. at 194 n. 8.

arrest, not the intention or motivation of the officer, determines the reasonableness of his or her use of force. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Reasonable, though mistaken, use of force justified by the circumstances as the officer observed them can also justify a particular use of force.  *Bennett v. Murphy*, 274 F.3d 133, 138 (3d Cir. 2002).  A determination regarding reasonableness must allow for the practical reality that officers are frequently called upon to make split-second decisions, under tense, quickly changing circumstances.  *Abraham*, 183 F.3d at 289.  It is not always realistic to expect "detached reflection" by an officer before acting in a particular situation. *Id.* (quoting *Brown v. United States*, 256 U.S. 335, 343 (1921)).

At the very least the scene on the night of September 7, 2007, was confused, and fighting had taken place. (ECF No. 48, C.S. at 21-22; ECF No. 41-2 at 6; ECF No. 41-7 at 27, 30, 31, 43). There are factual inconsistencies between plaintiff's and defendant's accounts of the events leading to and during defendant's arrest of plaintiff.  For example, defendant claimed that when he approached plaintiff initially, she continued to walk around and shout threats at other Club patrons, and was not responsive to his questioning until she calmed down. (ECF No. 41-14 at 4-7).  He alleged that following her placement in a police cruiser, she was tying-up the local 9-1-1 hotline with unnecessary calls and was endangering the wellbeing of others who may have needed emergency services. (ECF No. 41-14 at 9-10).  He asserts plaintiff failed to respond reasonably to defendant's requests for her phone and became violent and combative, necessitating the use of a certain degree of physical force to restrain her. (ECF No. 41-14 at 10-12).

Plaintiff denied the accuracy of defendant's allegations, and avers that at all times she was cooperative, sought – to no avail – defendant's assistance in calling an ambulance for medical attention, and was assaulted by defendant based upon false accusations of

combativeness, and for an unjustified demand for her phone. (ECF No. 44-1 at 2, 12-16). The accounts of plaintiff's daughter and friends with respect to this incident also provide varying details of the events that evening, including an account by plaintiff's daughter that defendant repeatedly punched and beat plaintiff even after she was removed from the police cruiser. (ECF No. 44-1 at 16; ECF No. 44-3 at 9-11; ECF No. 41-7 at 27, 30-31, 36-38). These relevant factual discrepancies require credibility determinations not amenable to resolution at summary judgment to determine whether the totality of the circumstances justified defendant's actions. Viewed in the light most favorable to plaintiff, the factual dispute presents a genuine issue of material fact regarding defendant's use of force. As a result, plaintiff's claim for excessive force must be allowed to proceed.

### C. *Heck Doctrine*

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a § 1983 claim could not be maintained "on the basis of events leading to a conviction which has not been reversed or impaired by other official proceedings" when a favorable judgment for the plaintiff in a civil case would imply that the conviction was invalid. *Nelson v. Jashurek*, 109 F.3d 142, 144 (3d Cir. 1997) (citing *Heck*, 512 U.S. at 485-87). To avoid the *Heck* doctrine, the prior criminal case must have concluded in a manner indicative of the innocence of the accused – a favorable termination. *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009) (citing *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002)). An underlying conviction must have been reversed or otherwise impaired. *Nelson*, 109 F.3d at 144. Where a finding for the plaintiff in a § 1983 claim, however, would not implicate the validity of a related criminal conviction, *Heck* will not bar the action. *Id.* at 145-46; *see Heck*, 512 U.S. at 486-87. Courts are required to examine such claims according to *Heck* and first determine whether the success of the claim would invalidate a

conviction or sentence. *See Flood v. Schaefer*, 240 F. App'x 474, 476 (3d Cir. 2007) (citing

*Gibson v. Superintendent*, 411 F.3d 427, 447-49 (3d Cir. 2005)); *see also Gilles v. Davis*, 427

F.3d 197, 209 (3d Cir. 2005). A case-by-case, fact-based determination is required. *Id.*

The Court of Appeals for the Third Circuit has recognized that a favorable termination

for a plaintiff can be shown by:

(a) a discharge by a magistrate at a preliminary hearing, or
(b) the refusal of a grand jury to indict, or
(c) the formal abandonment of the proceedings by the public prosecutor, or
(d) the quashing of an indictment or information, or
(e) an acquittal, or
(f) a final order in favor of the accused by a trial or appellate court.

*Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (citing § 659 RESTATEMENT (SECOND) OF

TORTS (1976); *Haefner v. Burkey*, 626 A.2d 519, 521 (Pa. 1993)). Further, though not an

admission of guilt, entrance into an ARD program is not a favorable termination. *Gilles v. Davis*,

427 F.3d 197, 209 (3d Cir. 2005). In Pennsylvania, ARD imposes burdens upon the defendant –

such as probation periods, fees, restitution, and potential future prosecution – which are

inconsistent with innocence. *Id.* at 210-11 (citing *Singleton v. City of New York*, 632 F.2d 185,

193-95 (2d Cir. 1980); *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992)). As such, ARD

does not satisfy *Heck*. *Id.* at 211-12.

Turosik entered into ARD with respect to one misdemeanor count of disorderly conduct.

(ECF No. 48, C.S. at 11, 48; ECF No. 41-32 at 9 – 10; ECF No. 41-33). Under Pennsylvania law

that offense is defined as follows:

**(a) Offense defined.**--A person is guilty of disorderly conduct if, with intent to cause
public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) engages in fighting or threatening, or in violent or tumultuous behavior;

(2) makes unreasonable noise;

(3) uses obscene language, or makes an obscene gesture; or

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 PA. CONS. STAT. § 5503 (disorderly conduct).

### (1) First Amendment Retaliation Claim

*Heck* will bar Plaintiff's First Amendment retaliation claim because of her entry into ARD with respect to 18 PA. CONS. STAT. § 5503 (disorderly conduct). In order to prove a First Amendment retaliation claim, plaintiff must demonstrate: (1) that she was engaged in protected activity; (2) that the government responded with retaliation; and, (3) that the protected activity was the cause of the retaliation. *McDonald v. Foltz*, No. 2:05cv901, 2007 WL 760509, at *13 (W.D.Pa. Mar. 8, 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)); *see also Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).

In attempting to show that defendant's filing of charges was retaliatory, plaintiff would be insinuating that the charges had no merit, but were merely meant to punish plaintiff's right to seek redress for alleged injuries. Specifically, plaintiff would be arguing that probable cause did not exist to arrest and prosecute. According to *Hartman v. Moore*, 547 U.S. 250 (2006), plaintiff is required to allege a lack of probable cause in a retaliation claim, and prove that it did not exist. *Id.* at 265-66. Plaintiff cannot accomplish this task, as is noted *supra*, pp. 10 – 15, because Plaintiff was charged with disorderly conduct due to her actions on September 7, 2007 – specifically, her act of throwing beer on Eaton. (ECF No. 44-2 at 8). Plaintiff at no point denied having engaged in this act, and in fact admitted she did. (ECF No. 41-1 at 21-22; ECF No. 46 at 8, 12). Her admission shows that there was a violation of section 5503(a). Additionally, Plaintiff's entering into ARD with respect to her misdemeanor charge of disorderly conduct was inconsistent with innocence with respect to that charge.

17

In fact, only one criminal charge against plaintiff was dismissed, and the others were *nol prossed* as part of an ARD agreement between plaintiff and the prosecutor, not because there was a demonstrated lack of probable cause with respect to those charges. In proving her retaliation claim, plaintiff would – in essence – be attacking the validity of her ARD, as she would be declaring her innocence with regard to a criminal charge that did not terminate in her favor. As the Supreme Court and Court of Appeals for the Third Circuit have held, this sort of attack is impermissible under *Heck*. *Nelson*, 109 F.3d at 144; *see Heck*, 512 U.S. at 485-87; *Kossler*, 564 F.3d at 187; *Donahue*, 280 F.3d at 383.

### (2) *Fourth Amendment Use of Excessive Force Claim*

Plaintiff's excessive force claim will survive *Heck*, however, because in challenging the reasonableness of the force used by defendant in effectuating her arrest, plaintiff is not necessarily challenging the validity of the criminal charges underlying her ARD. A § 1983 excessive force claim requires plaintiff to establish that a "seizure" occurred, and that the seizure was unreasonable. *Abraham v. Raso*, 183, F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). As a result, the fact that ARD is not a favorable termination will not preclude the § 1983 excessive force claim because the ARD is not implicated. *Nelson*, 109 F.3d at 145-46; *see Heck*, 512 U.S. at 486-87; *Flood*, 240 F.App'x. at 476; *Gilles*, 427 F.3d at 209.

### D. *Qualified Immunity*

The only remaining claim is the Fourth Amendment excessive use of force claim. Qualified immunity may relieve defendant of liability for his alleged use of excessive force. Qualified immunity can relieve an individual of liability for mistakes of law, mistakes of fact, and mistakes relating to mixed questions of law and fact. *Pearson v. Callahan*, 129 S.Ct. 808

(2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004); *Butz v. Economou*, 438 U.S. 478, 507 (1978)).  A finding of immunity, however, will be improper if there are "unresolved disputes of historical fact relevant to the immunity analysis." *Wright*, 409 F.3d at 599.

In order to conclude that an individual has qualified immunity, the court considers whether the facts as alleged by a plaintiff establish a constitutional right and whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson*, 129 S.Ct. at 816-18.  The Supreme Court, however, no longer mandates that courts rigidly adhere to a qualified immunity analysis requiring that a constitutional right be defined before turning to the question whether a right was clearly established. *Id.* at 817 – 22.  If it can first be determined that there was no clearly established right, the analysis need go no further, and a finding of qualified immunity is warranted.  *Id.* at 817 – 23 ("because the unlawfulness of [petitioners'] conduct . . . was not clearly established, petitioners are entitled to qualified immunity").  All the factual allegations must be viewed in the light most favorable to the plaintiff.  *Wright*, 409 F.3d at 600.  The "dispute does not turn upon 'which facts the parties might be able to prove, but rather, whether or not certain given facts showed a violation of 'clearly established' law.'" *Id.* at 599 (quoting *Johnson v. Jones*, 515 U.S. 304, 311 (1995)).

A "clearly established" statutory or constitutional right is one which a reasonable person would have known. *Gruenke v. Seip*, 225 F.3d 290, 298-99 (3d Cir. 2000).  A reasonably competent public official should be aware of the laws governing his or her conduct, and will not enjoy qualified immunity unless extraordinary circumstances existed, or it can be shown that the public official neither knew nor should have known about a particular legal right. *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Reasonableness" in this instance is an

objective standard. *Id.* (citing *Anderson*, 483 U.S. at 639). It is a fact-intensive inquiry, requiring:

> "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id.* at 299 (quoting *Anderson*, 483 U.S. at 639). "'[T]he question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights.'" *Id.* at 299-300 (quoting *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996) (citing *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990)). "'[A]ll but the plainly incompetent or those who knowingly violate the law' are protected by qualified immunity." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see Hunter v. Bryant*, 502 U.S. 224, 229 (1991); *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005).

The facts relevant to establishing whether defendant's manner of effectuating plaintiff's arrest was reasonable are rife with issues of credibility – as discussed above. There are a number of conflicting accounts regarding the events preceding plaintiff's arrest and the degree of force actually utilized by defendant. As such, viewing the facts in the light most favorable to the plaintiff, it is not possible for the court to determine as a matter of law that defendant acted reasonably under the circumstances. The credibility determinations the court would be required to make are not amenable to disposition at the summary judgment stage. Plaintiff's § 1983 claim regarding defendant's alleged use of excessive force will survive the motion for summary judgment.

### E. *Monell Claim*

Finally, as plaintiff's *Monell* claim was dismissed, without prejudice, by this court, and plaintiff advised that she is not reasserting a *Monell* claim (ECF No. 46 at 17), no *Monell* claim is pending.

## V.    CONCLUSION

Based upon the foregoing, the § 1983 claims for false arrest and malicious prosecution will not survive because probable cause existed to arrest plaintiff for disorderly conduct, and plaintiff's related state law claims are similarly barred under state law.  Because there was not a favorable termination for plaintiff, her § 1983 claim for First Amendment retaliation is barred by *Heck.*  The necessity of weighing credibility to establish whether force used by defendant when arresting plaintiff was excessive precludes summary judgment as to that § 1983 claim.  The *Monell* issue is moot.

Accordingly, the court will grant defendant's motion for summary judgment with respect to all claims made by plaintiff in her amended complaint (ECF No. 23), except for her § 1983 claim for use of excessive force in violation of the Fourth Amendment made applicable to the states by the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  An appropriate order follows.

By the court,

*s/ Joy Flowers Conti*
Joy Flowers Conti
United States District Judge

Dated: March 18, 2011.